**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| VOXTUR ANALYTICS CORP., an Ontario corporation (Canada), APPRAISERS NOW, LTD., an Alberta corporation (Canada) and APPRAISERS NOW US, LLC, a Delaware limited liability company, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 25-742-GBW-SRF |
| v. | ) ) ) | |
| MARTY HALDANE, an individual; AUTOMATIONRE INC., an Alberta corporation (Canada), AUTOMATIONRE (U.S.) INC., a Delaware corporation; DWELLING BLOCKS, LLC, a Delaware limited liability company; VIACHESLAV MEDNIKOV, an individual; RYAN DIAL, an individual; OLENA OVCHARENKO, an individual; and DOES 1 through 10, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**REPORT AND RECOMMENDATION[1]**

Presently before the court in this civil action for copyright infringement and trade secret misappropriation[2] are the following motions: (1) a renewed motion for a temporary restraining order ("TRO"), filed by plaintiffs Voxtur Analytics Corp. ("Voxtur"), Appraisers Now, Ltd. ("Anow Canada"), and Appraisers Now US, LLC ("Anow US;" collectively, "Plaintiffs"), (D.I.

---

[1] Pursuant to 28 U.S.C. § 636, the referral order dated August 18, 2025, (D.I. 72), and the parties' joint letter indicating their lack of consent to the jurisdiction of a Magistrate Judge, (D.I. 104), this decision is issued as a Report and Recommendation. *See Ali v. Howard*, C.A. No. 05-102-SLR-LPS, 2008 WL 4427209, at *1 n.5 (D. Del. Sept. 30, 2008) (explaining that the magistrate judge's authority with respect to a motion for TRO is limited to issuing a Report and Recommendation).

[2] Plaintiffs also assert claims for patent infringement and various state law causes of action which are not at issue in the motions addressed by this Report and Recommendation. (*See, e.g.*, D.I. 25 at ¶¶ 180-282)

29);[3] (2) a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil

Procedure 12(b)(2), filed by defendants AutomationRE Inc., Marty Haldane, Viacheslav

Mednikov, Ryan Dial, and Olena Ovcharenko (collectively, the "Canadian Defendants"), (D.I.

80);[4] and (3) a motion for an order requiring Plaintiffs to post a fee bond or, in the alternative, for

sanctions, filed by defendants AutomationRE (U.S.) Inc. and Dwelling Blocks, LLC (the "U.S.

Defendants;" together with the Canadian Defendants, "Defendants"), (D.I. 106).[5]  For the

following reasons, I recommend that the court:  (1) GRANT the motion to dismiss the Canadian

Defendants for lack of personal jurisdiction; (2) DENY Plaintiffs' renewed TRO motion; and

(3) DENY the motion for a fee bond.[6]

I.    **BACKGROUND**

This case concerns allegations that Defendants engaged in a scheme to copy Plaintiffs'

source code and steal Plaintiffs' trade secrets so Defendants could sell their own "knock-off"

appraisal management software platform.  (D.I. 25 at ¶¶ 1-14)

Anow Canada was founded in 2011 by Haldane, who worked with software developers

Dial, Mednikov, and Ovcharenko to develop an appraisal management software platform for real

---

[3] The briefing and filings associated with the pending motion for a TRO are found at D.I. 30, D.I. 31, D.I. 32, D.I. 33, D.I. 31, D.I. 33, D.I. 45, D.I. 52, D.I. 53, D.I. 54, D.I. 55, D.I. 56, D.I. 57, D.I. 58, D.I. 59, D.I. 61, D.I. 79, D.I. 87, D.I. 88, D.I. 160, D.I. 161, D.I. 162, and D.I. 164.  For purposes of this Report and Recommendation, the court has considered the exhibits associated with Defendants' notice of subsequent fact at D.I. 160, but it has not considered the parties' arguments at D.I. 160 or D.I. 161 per District of Delaware Local Rule 7.1.2(b).

[4] The briefing and filings associated with the pending motion to dismiss for lack of personal jurisdiction are found at D.I. 81, D.I. 82, D.I. 83, D.I. 115, and D.I. 123.

[5] The briefing and filings associated with the pending motion for fee bond are found at D.I. 107, D.I. 125, D.I. 126, D.I. 127, D.I. 128, D.I. 129, and D.I. 138.

[6] Two additional motions are currently pending: (1) Defendants' motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), (D.I. 84); and the motion to dismiss for failure to state a claim under Rule 12(b)(6) filed by third-party defendant Reggora, Inc., (D.I. 165).  The court has these pending motions under advisement and will address them in a separate Report and Recommendation.

estate appraisers and brokers called the Anow Software as a Service Appraisal Product (the "Anow Software").[7]  (D.I. 31 at ¶ 3)  The Anow Software is protected by U.S. Copyright Reg. No. TX 9-502-490 and U.S. Patent No. 11,631,058 ("the '058 patent").[8]  (D.I. 25 at ¶¶ 3-4) Plaintiffs claim the copyrighted material includes source code, specifications, documentation, and other content.  (*Id.* at ¶ 3)  In addition, Plaintiffs claim patent protection under the '058 patent, which is generally directed to methods and systems for scheduling real estate appraisal inspections using an automatic selection process that selects an appraisal inspection performer based on geography.  (*Id.* at ¶ 4)

On March 30, 2021, Voxtur acquired Anow Canada from Haldane for $30 million Canadian in a Share Purchase Agreement ("SPA") governed by Canadian law.  (D.I. 31, Ex. A at § 2.2)  Haldane continued to work for Anow Canada after the sale.  (D.I. 53 at ¶ 4)  Voxtur and Haldane entered into a Non-Competition, Non-Solicitation, and Confidentiality Agreement (the "Restrictive Agreement") as a required covenant to the SPA on April 8, 2021.  (D.I. 31, Ex. B) Under the Restrictive Agreement, Haldane could not compete with Plaintiffs, solicit customers, or solicit employees from Plaintiffs for a period of five years, and he agreed not to disclose Plaintiffs' confidential information.  (*Id.* at ¶ 6, Ex. B)

---

[7] Plaintiffs' opening brief and the accompanying declaration of Ryan Marshall define the platform as the "Anow Appraisal Management Platform." (D.I. 30 at 2; D.I. 31 at ¶ 7) Defendants' brief in opposition to the renewed TRO motion and Plaintiffs' reply brief refer to the software platform as "Voxtur Direct." (D.I. 52 at 3; D.I. 87 at 2) During oral argument, counsel referred to the software platform as "Anow Direct" or "Voxtur Direct." (10/8/2025 Tr. at 13:24-25)

[8] On August 13, 2025, the U.S. Copyright Office issued a second copyright registration (Registration No. TX 9-526-778), which covers improvements and updates made to the original software platform through November of 2024. (D.I. 88, Ex. OO) Plaintiffs attached the second copyright registration as an exhibit to their reply brief filed on August 22, 2025, and they disclosed the new registration during oral argument. (*Id.*; 10/8/2025 Tr. at 13:15-14:3) The parties dispute whether Plaintiffs can assert a copyright infringement claim against an accused product alleged to infringe a recently copyrighted derivative version of the software. (10/8/2025 Tr. at 36:7-12, 72:3-20)

In the summer of 2021, United Wholesale Mortgage ("UWM"),[9] a Michigan limited liability company, asked Haldane to build an application programming interface ("API") that would connect it directly to real estate appraisers. (D.I. 53 at ¶ 5)  Haldane introduced UWM to Voxtur, and development on the Voxtur Direct product began in July of 2021 in accordance with UWM's specifications. (*Id.*; D.I. 54 at ¶ 6)  Voxtur formed Anow US on July 29, 2021. (D.I. 32 at ¶ 4)

On September 29, 2021, Anow US and UWM entered into a Master Software as a Service Agreement (the "SaaS Agreement") concerning UWM's use of the Voxtur Direct software. (D.I. 53 at ¶ 6; Ex. 1)  Section 12 of the SaaS Agreement required Anow US to keep its source code in escrow and allowed UWM to obtain the source code from the escrow agent if Anow US entered bankruptcy, discontinued operations, or otherwise failed to provide the requisite services. (*Id.*)  Schedule C stated that all work performed by Anow US or UWM under the SaaS Agreement "shall be owned exclusively by UWM," and any technology not assigned outright to UWM would be licensed to it. (*Id.*)  Voxtur Direct launched on October 1, 2021. (*Id.* at ¶ 5)

Voxtur terminated Haldane's employment in May of 2022. (D.I. 53 at ¶ 8)  But the following year, Voxtur asked Haldane to return and Haldane initially declined. (*Id.* at ¶ 9)  Instead, Haldane began developing his own workflow management software with broader applications than real estate appraisals. (*Id.* at ¶ 10)  To facilitate the development of this software, Haldane registered the domain names dwellingblocks.com and automationre.com,

---

[9] UWM is the largest mortgage lender in the United States. (D.I. 31 at ¶ 12; D.I. 53 at ¶ 5) UWM was Plaintiffs' first customer that was not an appraiser or an appraisal management company, and it was a key customer of Plaintiffs. (*Id.*)

founded AutomationRE Inc. in Canada, and assigned all rights in his software to AutomationRE

Inc. in October of 2023.  (*Id.* at ¶¶ 10, 14)

Voxtur was aware of AutomationRE Inc.'s existence and Haldane's operation of

AutomationRE Inc. under the business name "Dwelling Blocks," but it continued to recruit him.

(*Id.*)  At oral argument, Plaintiffs' counsel submitted an unsigned version of a proposed

employment agreement between Haldane and Voxtur which was marked as Exhibit 73 to

Haldane's deposition transcript.  (10/9/2025 Tr. at 110:2-8)  This version of the agreement,

which was sent to Haldane for signature on November 21, 2023, contains an integration clause

providing that it supersedes any prior agreements or understandings, with a carve out for "any

non-competition, non-solicitation, confidentiality, invention assignment or similar agreement

with Voxtur . . . which shall be in addition to, and not superseded by, this Agreement."  (*Id.* at

110:9-22)

Voxtur ultimately rehired Haldane in accordance with the terms of an employment

agreement signed by Haldane on November 29, 2023 (the "Employment Agreement") that omits

the carve out provision contained in the November 21, 2023 version of the document.[10]  (D.I. 31,

Ex. H at ¶ 11(d))  The Employment Agreement also preserves Haldane's ownership interest in

the software he developed through AutomationRE Inc. and provides that software developed

during Haldane's employment with Voxtur would be the sole property of Voxtur or its affiliates.

(*Id.*, Ex. H at ¶ 6(d) & Ex. A; D.I. 53 at ¶¶ 11-13)  Under the terms of the Employment

Agreement, a breach of Haldane's obligations regarding Voxtur's confidential information

---

[10] At oral argument, Plaintiffs suggested that there was a "potentially live dispute" about which of
these two versions of the Employment Agreement governs.  (10/8/2025 Tr. at 110:23-111:1)  As
Defendants explained, however, the Marshall Declaration filed by Plaintiffs in support of their
TRO motion represents that the Employment Agreement executed between Haldane and Voxtur
on November 29, 2023 is the operative employment agreement.  (*Id.* at 58:20-59:6; D.I. 31 at ¶
24 & Ex. H)

"would give rise to irreparable harm to Voxtur and/or its Affiliates[.]" (D.I. 31, Ex. H at ¶ 5(d)(ii))

In February of 2024, UWM informed Voxtur that it would look for other software vendors due to UWM's concerns about Voxtur's finances, including financial statements showing that Voxtur was close to bankruptcy. (D.I. 53 at ¶ 16) In June of 2024, Haldane formed a U.S. entity called AutomationRE (U.S.) Inc. to facilitate the execution of a consulting agreement with UWM. (D.I. 88, Ex. NN at 238:9-25) Under the terms of the draft Appraisal Technology Consulting Agreement (the "Draft Consulting Agreement"), AutomationRE (U.S.) Inc. would serve as an independent contractor to develop software in conformance with UWM's specifications, and Voxtur would agree to waive any potential conflicts between itself and AutomationRE (U.S.) Inc. (D.I. 53, Ex. 2) However, Voxtur refused to sign the Draft Consulting Agreement or put its source code in escrow in accordance with the terms of the prior SaaS Agreement. (*Id.* at ¶ 18) During this time, Voxtur also considered selling Anow Canada and Anow US to a third party. (D.I. 31 at ¶ 35)

Haldane resigned from Voxtur on August 30, 2024, and Dial, Mednikov, and Ovcharenko resigned around the same time. (D.I. 53 at ¶ 22; D.I. 31 at ¶¶ 24, 27-29, 31) Following the resignation of Haldane and the software developers, Plaintiffs discovered evidence that they had improperly accessed and allegedly stolen Plaintiffs' trade secret information. (D.I. 31 at ¶ 31) The investigation indicated that Mednikov had accessed Plaintiffs' source code repository and sent confidential source code to his personal email address on at least five separate occasions between December 11, 2023 and May 3, 2024. (*Id.* at ¶ 32; Ex. M) Moreover, Dial kept his computer containing Plaintiffs' trade secrets following his resignation instead of returning the computer to Plaintiffs. (*Id.* at ¶ 33; D.I. 25 at ¶ 52)

On September 5, 2024, UWM asked Haldane to develop new software. (D.I. 53 at ¶ 23) Haldane started development of the Dwelling Blocks software in accordance with a list of UWM's deliverables included in a draft contract. (*Id.* at ¶ 24) The final contract between UWM and AutomationRE (U.S.) Inc. has an effective date of September 13, 2024. (*Id.*; Ex. 3) Dial, Mednikov, and Ovcharenko worked with Haldane to develop the new Dwelling Blocks software platform as employees of AutomationRE Inc. (*Id.* at ¶¶ 24, 27-28)

On January 7, 2025, Haldane formed a new Delaware entity, Dwelling Blocks, LLC, to match the name of the new software platform developed for UWM. (D.I. 53 at ¶ 26; D.I. 31, Ex. C) AutomationRE (U.S.) Inc. is the sole member of Dwelling Blocks, LLC, and Dwelling Blocks, LLC has no employees or products for sale. (*Id.*) The first sale of the Dwelling Blocks software occurred on March 20, 2025, and the product officially launched on April 16, 2025. (D.I. 53 at ¶ 24) During this time, Voxtur sent Haldane a series of cease-and-desist letters. (D.I. 31 at ¶ 43; Ex. P)

Meanwhile, on January 14, 2025, Voxtur publicly announced it had started the process to sell Anow Canada and Anow US to a third party, culminating in a non-binding letter of intent ("LOI") signed on April 2, 2025. (D.I. 31 at ¶¶ 36-37) However, the third party withdrew from the transaction on April 21, 2025 after the due diligence process suggested that "Dwelling Blocks has heavily copied a substantial amount of exact Anow Code." (*Id.* at ¶¶ 38-39)

On April 15, 2025, UWM sent its partners, including Plaintiffs, an email regarding its intention to use Dwelling Blocks as an appraisal management platform in addition to the Anow Software. (*Id.* at ¶¶ 22, 40; Ex. F) After Plaintiffs filed this lawsuit on June 16, 2025, UWM formally adopted Dwelling Blocks as its new software platform and ended its use of the Anow

Software.  (D.I. 31 at ¶ 44; Ex. Q)  Plaintiffs terminated their contract with UWM sometime in

September of 2025.[11]  (10/8/2025 Tr. at 105:8-11)

Before filing this lawsuit, Plaintiffs retained Datamatics to analyze the parties' web

applications and identify evidence of copying.  Datamatics issued its report on May 19, 2025,

stating that "we cannot conclusively determine that dwellingblocks.com was built using

misappropriated source code from anow.com."  (D.I. 59, Ex. A at 4)  Although the analysis

found similarities in the API structures, schema, functional outcomes, and user interactions, there

were discrepancies in the directory structures, design choices, and layouts.  (*Id.*, Ex. A at 61)

Datamatics concluded that the similarities were likely the result of conceptional influence rather

than direct code copying.  (*Id.*)  Plaintiffs have not proffered the findings in the Datamatics

report as expert opinion.  (10/9/2025 Tr. at 27:6-13)

Plaintiffs brought this suit on June 16, 2025 and filed their original TRO motion two days

later.  (D.I. 1; D.I. 10)  On July 10, 2025, Plaintiffs filed their first amended complaint asserting

thirteen causes of action for: (1) copyright infringement; (2) violations of the Digital Millennium

Copyright Act, 17 U.S.C. § 1201, *et seq.*; (3) misappropriation of trade secrets; (4) patent

infringement; (5) civil conspiracy; (6) breach of fiduciary duties; (7) aiding and abetting breach

of fiduciary duties; (8) tortious interference with contracts; (9) tortious interference with business

relations; (10) violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; (11) breach

of contract against Haldane; (12) breach of contract against Mednikov, Dial, and Ovcharenko;

and (13) conversion.  (D.I. 25)  The following day, Plaintiffs docketed the pending renewed TRO

---

[11] At oral argument, Plaintiffs explained that their SaaS Agreement with UWM contained an escrow provision giving an escrow company possession of the Anow Software source code for the duration of the SaaS Agreement.  (10/8/2025 Tr. at 105:23-106:7)  Thus, to terminate the escrow agreement and regain possession of the Anow Software source code, Plaintiffs had to terminate the SaaS Agreement with UWM.  (*Id.*)

motion. (D.I. 29)  The parties stipulated to an extended briefing schedule on the renewed TRO

motion. (D.I. 40)  On August 19, 2025, before briefing on the renewed TRO motion was

complete, the court scheduled oral argument on the renewed TRO motion for October 8, 2025.

(D.I. 77)

 Further developments arose after the court held oral argument on the renewed TRO

motion.  On November 10, 2025, Plaintiffs initiated insolvency proceedings in the Ontario

Superior Court of Justice to restructure and sell themselves.  (D.I. 160 at 1, Ex. A)  The

following day, Plaintiffs filed a Chapter 15 bankruptcy petition for recognition of a foreign

proceeding in the United States Bankruptcy Court for the District of Delaware. *See In re Voxtur*

*Analytics Corp., et al.*, Bankr. Case No. 25-11996, D.I. 1 (Bankr. D. Del. Nov. 11, 2025).  On

November 13, 2025, the Bankruptcy Court entered a provisional order regarding application of

the automatic stay under 11 U.S.C. § 362(a), which provides:

> Section 362 of the Bankruptcy Code shall apply with respect to each of the
> Debtors and the property of each of the Debtors that is within the territorial
> jurisdiction of the United States . . . [including] the commencement or
> continuation, including the issuance or employment of process of, any judicial,
> administrative or any other action or proceeding involving or against the Debtors
> or their assets or proceeds thereof, or to recover a claim or enforce any judicial,
> quasi-judicial, regulatory, administrative or other judgment, assessment, order,
> lien or arbitration award against the Debtors or their assets or proceeds thereof, or
> to exercise any control over the Debtors' assets, located in the United States
> except as authorized by the Debtors in writing.

(D.I. 162, Ex. A at ¶ 1(b)(i))

## II.    DISCUSSION

 As a preliminary matter and following consideration of the parties' respective positions,

(D.I. 160; D.I. 161; D.I. 162; D.I. 164), the court addresses the application of the Section 362(a)

automatic stay to these proceedings and finds that the automatic stay does not preclude

adjudication of the three pending motions addressed herein. The court construes the scope of the

automatic stay consistent with the governing statute, which provides that the stay applies to

> the commencement or continuation, including the issuance or employment of
> process, of a judicial, administrative, or other action or proceeding *against the
> debtor* that was or could have been commenced before the commencement of the
> case under this title, or to recover a claim *against the debtor* that arose before the
> commencement of the case under this title[.]

11 U.S.C. § 362(a)(1) (emphasis added). It is well-established that "the automatic stay does not

apply to actions brought by the debtor. Rather, the automatic stay only applies to actions brought

against the debtor." *In re Kaiser Aluminum Corp.*, 303 B.R. 299, 303 (D. Del. 2003) (citing

*Rhone-Poulenc Surfactants & Specialties, L.P. v. C.I.R.*, 249 F.3d 175, 180 (3d Cir. 2001)). The

parties agree that, to the extent Plaintiffs' claims proceed under Section 362(a), the court may

issue a ruling on Plaintiffs' renewed TRO motion (D.I. 29) and Defendants' motion to dismiss

for lack of personal jurisdiction (D.I. 80). (D.I. 164 at 2-3) They disagree as to whether the

court may rule on Defendants' pending motion for fee bond or, alternatively, for sanctions, at

D.I. 106. (*Id.*)

Defendants cite authority holding that neither a motion for fee bond nor a motion for

sanctions fall within the scope of the automatic stay. In *Ferguson v. Bucks County Farms, Inc.*,

the Third Circuit concluded that the requirement under Rule 65(c) to post security *upon the

issuance* of a TRO or preliminary injunction applied to a debtor in bankruptcy. 280 F.2d 739,

746 (3d Cir. 1960) (emphasis supplied). Likewise, "[a] litigant should not be allowed to delay

the imposition of sanctions indefinitely by the expedient of declaring bankruptcy." *Alpern v.

Lieb*, 11 F.3d 689, 690 (7th Cir. 1993). Plaintiffs do not cite any case authority to the contrary,

nor do they offer substantive argument on how sanctions or a fee bond fit within the categories

listed in Section 362(a). (D.I. 164 at 2) In any event, the court need not address whether the stay

precludes posting a fee bond because it recommends denying Defendants' motion for the reasons discussed at Section II.C, *infra*.

The court first considers the threshold issue of personal jurisdiction before turning to the renewed TRO motion. *See In re Diet Drugs*, 282 F.3d 220, 229 (3d Cir. 2002) ("[P]reliminary matters such as . . . personal jurisdiction . . . should be raised and disposed of before the court considers the merits or quasi-merits of a controversy.").

## A.     Personal Jurisdiction

A defendant may move to dismiss a lawsuit for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). Fed. R. Civ. P. 12(b)(2); *Nespresso USA, Inc. v. Ethical Coffee Co. SA*, 263 F. Supp. 3d 498, 502 (D. Del. 2017). Once a challenge to personal jurisdiction is raised, the plaintiff bears the burden of establishing personal jurisdiction. *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007) (citation omitted). When personal jurisdiction is challenged in the context of a motion for a temporary restraining order or preliminary injunction, the plaintiff must rely on evidence establishing a reasonable probability of ultimate success on the issue of personal jurisdiction.[12] *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Kozeny*, 19 F. App'x 815, 822 (10th Cir. 2001); *Al Ghena Int'l Corp. v. Radwan*, 957 F. Supp. 2d 511, 532 n.17 (D.N.J. 2013); *Homeschool Buyers Club, Inc. v. Brave Writer, LLC*, 2020 WL 1166053, at *7 (S.D.N.Y. Mar. 11, 2020) (explaining that "a *prima facie* showing of jurisdiction will not suffice where a plaintiff seeks preliminary injunctive relief." (internal citations and quotations omitted)). The court must construe disputed facts in favor of

---

[12] At oral argument, the parties acknowledged that the Third Circuit has not expressly addressed the issue, but they agreed that Plaintiffs bear the burden to show a reasonable probability of success on the issue of personal jurisdiction in the context of the TRO motion. (10/8/2025 Tr. at 52:8-19, 53:4-21, 88:11-89:1, 90:2-18)

the plaintiff. *Carteret Sav. Bank v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992) (citations omitted); *see Robert Bosch LLC v. Alberee Prod., Inc.*, 70 F. Supp. 3d 665, 672 (D. Del. 2014).

To determine whether personal jurisdiction exists, the court typically engages in a two-part analysis. First, the court must determine whether the defendant's actions fall within the scope of the state's long-arm statute. *See E.I. DuPont de Nemours & Co. v. Rhodia Fiber & Resin Intermediates*, 197 F.R.D. 112, 119 (D. Del. 2000). The Delaware long-arm statute provides that:

> [A] court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
>
> (1) Transacts any business or performs any character of work or service in the State;
>
> (2) Contracts to supply services or things in this State;
>
> (3) Causes tortious injury in the State by an act or omission in this State; [or]
>
> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State[.]

10 *Del. C.* § 3104(c)(1)-(4). Subsections (c)(1), (c)(2), and (c)(3) confer specific jurisdiction in which the cause of action arises from the defendant's contacts with the forum. *Shoemaker v. McConnell*, 556 F. Supp. 2d 351, 354-55 (D. Del. 2008). "Subsection (c)(4) provides for general jurisdiction, which requires a greater extent of contacts, but which provides jurisdiction even when the claim is unrelated to the forum contacts." *See Applied Biosystems, Inc. v. Cruachem, Ltd.*, 772 F. Supp. 1458, 1466 (D. Del. 1991). "The Delaware long-arm statute . . . is to be broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause." *Kabbaj v. Simpson*, 547 F. App'x 84, 86 n.6 (3d Cir. 2013).

At the second step, the court must determine whether the exercise of jurisdiction comports with the Due Process Clause of the Constitution. *E.I. DuPont de Nemours*, 197 F.R.D. at 119. Constitutional due process is satisfied if "sufficient minimum contacts exist between the defendant and the forum state to satisfy traditional notions of fair play and substantial justice." *TriStrata Tech., Inc. v. Emulgen Labs., Inc.*, 537 F. Supp. 2d 635, 641 (D. Del. 2008). The purpose of this requirement is to ensure that the "defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *Id.* (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

In some cases, disputes over personal jurisdiction implicate Federal Rule of Civil Procedure 4(k)(2), which serves as a federal long-arm statute. *See Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 455 (3d Cir. 2003); *Ocimum Biosols. (India) Ltd., Tr. of Ocimum Biosols. Inc. v. LG Chem. Ltd.*, C.A. No. 19-2227-MN, 2022 WL 3354708, at *16 (D. Del. July 31, 2022). To establish personal jurisdiction under Rule 4(k)(2), the plaintiff must establish the existence of: (1) a claim arising under federal law; (2) a defendant who is beyond the jurisdictional reach of any state court of general jurisdiction; and (3) sufficient contacts between the defendant and the United States for purposes of the constitutional due process requirement. *Saudi v. Acomarit Maritimes Servs., S.A.*, 114 F. App'x 449, 455 (3d Cir. 2004); *see also Ocimum Biosols. (India) Ltd.*, 2022 WL 3354708, at *16. "The third requirement under Rule 4(k)(2)—the due process analysis—contemplates a defendant's contacts with the entire United States, as opposed to the state in which the district court sits." *Mallinckrodt PLC v. Airgas Therapeutics LLC*, C.A. No. 22-1648-RGA, 2024 WL 1251260, at *2 (D. Del. Mar. 22, 2024) (internal quotation marks and citation omitted).

### 1.  Waiver

Before reaching the Canadian Defendants' challenges to the exercise of personal

jurisdiction under Rule 12(b)(2), the court first addresses Plaintiffs' assertion that the Canadian

Defendants waived any personal jurisdiction defense by participating in discovery and briefing

on the merits of Plaintiffs' TRO motion.  (D.I. 87 at 1; D.I. 115 at 4-7)  At oral argument,

Plaintiffs identified waiver as their strongest argument supporting personal jurisdiction over

Haldane, Mednikov, and Dial.  (10/9/2025 Tr. at 96:25-97:5)

Plaintiffs' waiver argument is not persuasive because the Canadian Defendants

"diligently advanc[ed] [their] procedural objections."  *In re Asbestos Prods. Liab. Litig. (No. VI)*,

921 F.3d 98, 105 (3d Cir. 2019).  The Canadian Defendants substantively raised their personal

jurisdiction argument at the first available opportunity in their opposition to Plaintiffs' TRO

motion, preserved their right to challenge personal jurisdiction in a motion to dismiss, and timely

filed their Rule 12(b)(2) motion to dismiss the following week.  (D.I. 52 at 9-10; D.I. 80)  The

fact that the Canadian Defendants also agreed to limited discovery and responded to the

arguments raised in the TRO motion cannot reasonably be construed as consent to personal

jurisdiction.  *See Moog Inc. v. Skyryse, Inc.*, 2022 WL 17720965, at *7 (W.D.N.Y. Dec. 15,

2022) ("Moog's argument that the defendants somehow consented to personal jurisdiction . . .

for the purposes of resolving its preliminary injunction motion while simultaneously preserving

their motions to dismiss until after that preliminary injunction was resolved makes no sense.").

Haldane, Mednikov, and Dial's declarations and deposition testimony[13] on the TRO motion do

not alter the analysis because Mednikov and Dial preserved their personal jurisdiction defenses

---

[13] At oral argument, Plaintiffs conceded that their waiver argument does not extend to
Ovcharenko because she did not submit a declaration or sit for deposition.  (10/8/2025 Tr. at
92:14-22) (explaining that the waiver argument "applies, admittedly not to one of the employee
defendants, Ovcharenko.  She did not submit a Declaration[.]").

in their declarations, and counsel reiterated their objections to personal jurisdiction on behalf of all three individual Canadian Defendants at the outset of each deposition. (D.I. 54 at ¶ 2; D.I. 55 at ¶ 2; D.I. 88, Ex. JJ at 8:7-11; Ex. LL at 5:25-6:4; Ex. NN at 5:25-6:3) Thus, the Canadian Defendants' participation in discovery regarding the TRO motion does not amount to a waiver of their personal jurisdiction defense. *See Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010) (finding no waiver when a defendant requested expedited discovery to prepare for a preliminary injunction hearing and then filed a Rule 12(b)(2) motion to dismiss thirteen days later).

The two cases cited by Plaintiffs in support of their waiver argument are distinguishable on their facts. (D.I. 115 at 4-7) In *In re Asbestos Products Liability Litigation (No. VI)*, the district court gave the defendants a choice between waiving their personal jurisdiction defenses or submitting to a transfer of the case to a court where personal jurisdiction existed. 921 F.3d at 106. The Third Circuit determined that the defendants "unequivocally waived their personal jurisdiction defenses when they filed answers" in the original venue, thereby signaling their intention to waive the jurisdictional defense under the agreed-upon procedure. *Id.* at 106-07. In contrast, the Canadian Defendants have not affirmatively waived their personal jurisdiction defense.

In *Wyrough & Loser, Inc. v. Pelmor Labs., Inc.*, the Third Circuit held that the defendant waived its personal jurisdiction defense by participating in a hearing on a preliminary injunction motion before raising its personal jurisdiction defense for the first time in a motion to dismiss filed nearly a month later. 376 F.2d 543, 547 (3d Cir. 1967). Here, however, the Canadian Defendants raised their personal jurisdiction defense in their opposition to the TRO motion as a basis to deny that motion, and they followed up by filing a Rule 12(b)(2) motion to dismiss

which was fully briefed prior to the hearing on the TRO motion. Unlike the circumstances in *Wyrough*, this court can consider the personal jurisdiction issue before reaching the merits of Plaintiffs' TRO motion. *See Moog*, 2022 WL 17720965, at \*6-7 (holding that the court "cannot enter injunctive relief—even preliminarily—before addressing challenges to personal jurisdiction and venue."). Consequently, the Canadian Defendants have not waived their personal jurisdiction defense.

### 2. Delaware long-arm statute

Plaintiffs point to the Delaware long-arm statute as their second-best argument in support of personal jurisdiction. (10/8/2025 Tr. at 97:14-22) In the briefing on their TRO motion, Plaintiffs cite the general jurisdiction provision at 10 *Del. C.* § 3104(c)(4), arguing that the Canadian Defendants are subject to personal jurisdiction due to their ownership interest in AutomationRE (U.S.) Inc. and Dwelling Blocks, LLC, the entities responsible for the distribution and sale of the allegedly infringing software to U.S. consumers. (D.I. 30 at 8-9) Under this agency theory of general jurisdiction, the court may attribute the Delaware contacts of the subsidiary to the parent only "where the subsidiary acts on the parent's behalf or at the parent's direction." *Eastman Chem. Co. v. AlphaPet Inc.*, C.A. No. 09-971-LPS-CJB, 2011 WL 6004079, at\*12 (D. Del. Nov. 4, 2011) (quoting *C.R. Bard, Inc. v. Guidant Corp.*, 997 F. Supp. 556, 560 (D. Del. 1998)). The court considers factors including "[1] the extent of overlap of officers and directors, [2] methods of financing, [3] the division of responsibility for day-to-day management, and [4] the process by which each corporation obtains its business." *Applied Biosystems, Inc. v. Cruachem, Ltd.*, 772 F. Supp. 1458, 1463 (D. Del. 1991).

Plaintiffs allege that Haldane, Mednikov, Dial, and Ovcharenko "own 100% of AuotmationRE Inc., which owns AutomationRE (US) Inc., which wholly owns Dwelling Blocks,

LLC[,]" and, therefore, AutomationRE (U.S.) Inc. and Dwelling Blocks, LLC are "clearly agents of the Employee Defendants, led by Haldane, all of whom acted in concert to steal Plaintiffs' software and customers." (D.I. 30 at 8-9)  Plaintiffs cite no evidence in support of this assertion in their briefing on the TRO motion.[14]

In their briefing on the Rule 12(b)(2) motion to dismiss, Plaintiffs support their agency theory by citing to Haldane's declaration and deposition transcript to show an overlap in officers and directors and the formation of AutomationRE (U.S.) Inc. for the purpose of doing business with UWM.  (D.I. 53 at ¶¶ 1, 26; D.I. 88, Ex. NN at 32:7-12, 36:9-38:14)  But the fact that a parent and a subsidiary have common officers or directors does not automatically establish an agency relationship.  *E.I. du Pont de Nemours & Co. v. Agfa-Gavaert NV*, 335 F. Supp. 3d 657, 670 (D. Del. 2018) (citations omitted).  Moreover, Haldane's deposition testimony was equivocal, and Plaintiffs have not produced regulatory filings, public statements, press releases, financial statements, or other evidence to support the existence of an agency relationship under the remaining factors.  *Cf. Enzo Life Scis., Inc. v. Hologic Inc.*, C.A. No. 16-894-LPS-CJB, 2018 WL 4660355, at *3-4 (D. Del. Sept. 26, 2018) (finding plaintiff established *prima facie* case of agency jurisdiction through evidence of government filings, public statements, press releases, and financial statements).  On this record, Plaintiffs have not met their burden to show a reasonable probability of success on the issue of personal jurisdiction based on an agency theory of jurisdiction under 10 *Del. C.* § 3104(c)(4).

---

[14] Plaintiffs cite "Miller Decl. at ¶ X." (D.I. 30 at 9)  However, the Miller Declaration accompanying the opening brief on the TRO motion only has nine paragraphs, and the exhibits to that declaration do not include an Exhibit X. (D.I. 33)  Therefore, Plaintiffs' evidentiary support for this point is not ascertainable.  Plaintiffs' reply brief on the TRO motion cites the parties' briefing, but no evidence, in support of the ownership interests in the Delaware entities. (D.I. 87 at 1)

In connection with the Canadian Defendants' Rule 12(b)(2) motion to dismiss, Plaintiffs assert specific jurisdiction pursuant to Section 3104(c)(1) of the Delaware long-arm statute. (D.I. 115 at 7-9)  Under this theory, Plaintiffs contend that the Canadian Defendants purposefully availed themselves of the privilege of conducting activities in Delaware by forming corporate entities in Delaware. (*Id.* at 7)  In support, Plaintiffs cite a Delaware case holding that "[a] single act of incorporation in Delaware will suffice to confer personal jurisdiction over a nonresident defendant if such purposeful activity in Delaware is an integral component of the total transaction to which plaintiff's cause of action relates." *Shamrock Holdings of Cal., Inc. v. Arenson*, 421 F. Supp. 2d 800, 804 (D. Del. 2006).  But the holding in *Shamrock* was expressly based on the fact that "the causes of action at issue in the suit arise from, and relate to, the incorporation and formation of" the Delaware entities. *Id.* at 804 & n.2 (noting that the causes of action included breach of the entities' operating agreement).  Here, in contrast, Plaintiffs' causes of action focus on the SPA, the employment agreements, and other contracts executed between Plaintiffs and the Canadian Defendants. (D.I. 25 at ¶¶ 207-47, 259-82)  These agreements are not directly related to the formation of the Delaware corporate entities. *See You Map, Inc. v. Snap Inc.*, C.A. No. 20-162-CFC-JLH, 2021 WL 3171838, at *6 n.6 (D. Del. July 27, 2021) ("[M]erely participating in the formation of a Delaware entity, without more, does not create a basis for [personal] jurisdiction in Delaware." (internal quotation marks and citations omitted)); *report and recommendation adopted*, 2022 WL 4377031 (D. Del. Sept. 22, 2022).

Plaintiffs also contend that the Canadian Defendants are subject to specific jurisdiction under Section 3104(c)(3) of the Delaware long-arm statute, which provides jurisdiction over those causing "tortious injury in the State by an act or omission in this State." 10 *Del. C.* § 3104(c)(3).  But Plaintiffs have not shown that the Canadian Defendants transacted any direct

or indirect business in Delaware. *See Commisseriat A L'Energie Atomique v. Chi Mei Optoelecs. Corp.*, 293 F. Supp. 2d 423, 429 (D. Del. 2003) (finding no personal jurisdiction over foreign defendant under Section 3104(c)(3) where foreign defendant's product was incorporated into another product and sold by other entities in Delaware).  Instead, Plaintiffs' allegations focus on customers' use of UWM's software throughout the United States.  (D.I. 115 at 8)

There is no evidence that any of the Canadian Defendants contracted with UWM. Rather, the record shows that UWM, Plaintiffs, and AutomationRE (U.S.) Inc. negotiated the Draft Consulting Agreement without naming any of the Canadian Defendants.  (D.I. 53, Ex. 2) Plaintiffs' cited case authority does not support their position that U.S. customers' use of UWM's software throughout the U.S. is enough to attribute tortious injury in Delaware to the Canadian Defendants under Section 3104(c)(3).  *Cf. Robert Bosch LLC v. Alberee Prods., Inc.*, 70 F. Supp. 3d 665, 676 (D. Del. 2014) (finding jurisdiction under Section 3104(c)(3) based on the defendants' distribution of windshield wiper blades in the stream of commerce, which were then sold by the plaintiff to a retail location in Delaware).  Plaintiffs have not satisfied their evidentiary burden to show the Canadian Defendants are subject to personal jurisdiction under the Delaware long-arm statute, relying instead on statements made in the briefing and their FAC. *Cf. Enzo Life Scis., Inc.*, 2018 WL 4660355, at *3-4 (finding plaintiff satisfied *prima facie* burden to establish personal jurisdiction over the defendant's corporate parent by citing to government filings, public statements, press releases, and financial disclosures).

Because "[t]he constitutionality of an exercise of specific jurisdiction turns on whether the defendant has 'purposefully directed' its activity toward the forum state[,]" Plaintiffs' failure to satisfy its burden on specific jurisdiction also renders the exercise of jurisdiction over the

Canadian Defendants unconstitutional under the Due Process Clause. *See Applied Biosystems*, 772 F. Supp. at 1470.

### 3. Alter ego theory

Plaintiffs identify their alter ego theory as their third strongest argument in support of personal jurisdiction, arguing that AutomationRE (U.S.) Inc. and Dwelling Blocks, LLC were formed to enable the Canadian Defendants to avoid liability. (10/8/2025 Tr. at 97:23-25) To evaluate jurisdiction under an alter ego theory, courts in the Third Circuit consider seven factors: (1) gross undercapitalization; (2) failure to observe corporate formalities; (3) non-payment of dividends; (4) insolvency of the debtor corporations at the time; (5) siphoning of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) whether the corporation is merely a façade. *Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 365 (3d Cir. 2018). Moreover, "it is necessary for a plaintiff seeking to make an alter ego showing to demonstrate that there has been an element of fraud or inequity in the misuse of the corporate form." *Sierra v. Trafigura Trading LLC*, C.A. No. 22-366-JLH-CJB, 2024 WL 3823018, at *12 (D. Del. Aug. 14, 2024).

Plaintiffs have not met their burden to show a reasonable probability of success on the issue of personal jurisdiction based on their alter ego theory.[15] Although no single factor is dispositive and the court must consider the totality of the circumstances, Plaintiffs address only three of the seven alter ego factors. (D.I. 115 at 14-16); *see Trinity Indus.*, 903 F.3d at 365. The evidence Plaintiffs cite in support of these three factors is again limited to Haldane's declaration

---

[15] Plaintiffs' answering brief on the Canadian Defendants' Rule 12(b)(2) motion focuses on the requirements to establish a *prima facie* case of personal jurisdiction in Delaware via the alter ego theory. (D.I. 115 at 13) However, Plaintiffs clarified at oral argument that the appropriate standard is a reasonable probability of success in proving personal jurisdiction. (10/8/2025 Tr. at 90:2-18)

and deposition testimony, which is insufficient to establish a reasonable probability of success for the reasons previously discussed at § II.A.2, *supra*. (D.I. 53 at ¶¶ 1, 26; D.I. 88, Ex. NN) And although Plaintiffs acknowledge that fraud or inequity must be shown before the court can treat a subsidiary as the alter ego of the parent, they describe an overall blurring of corporate lines without specifically identifying fraud or injustice by the Canadian Defendants. (D.I. 115 at 13-16)

### 4. Remaining jurisdictional arguments

Plaintiffs raise several other personal jurisdiction arguments in response to the Canadian Defendants' Rule 12(b)(2) motion. During the hearing, Plaintiffs did not identify these theories of jurisdiction among their strongest. (10/8/2025 Tr. at 96:21-101:12) For the reasons set forth below, Plaintiffs' remaining jurisdictional arguments do not establish personal jurisdiction over any of the Canadian Defendants.

Plaintiffs argue that Haldane is subject to jurisdiction under 10 *Del. C.* § 3114(b), which provides that a nonresident officer of a Delaware corporation shall be deemed to have consented to personal jurisdiction in an action "in which such officer is a necessary or proper party, or in any action or proceeding against such officer for violation of a duty in such capacity[.]" 10 *Del. C.* § 3114(b). In support of their argument that Haldane is a necessary party, Plaintiffs cite Haldane's role as CEO of both AutomationRE Inc. and AutomationRE (U.S.) Inc., arguing that this gives him a legal interest in the suit and his rights may be materially affected by a judgment. (D.I. 115 at 17) Plaintiffs also contend that Haldane is a proper party under Section 3114(b) because he illegally developed competing software and stole employees, software, and confidential information from Plaintiffs for the benefit of himself, AutomationRE (U.S.) Inc., and Dwelling Blocks, LLC. (*Id.*)

Plaintiffs refer to several causes of action by number without explaining how those claims establish Haldane's status as a necessary or proper party under Section 3114(b). They acknowledge that Section 3114(b) authorizes "jurisdiction over corporate fiduciaries who use their position to commit wrongs on behalf of the corporation in actions where the corporation is properly before the court," but they do not specify which actions Haldane took on behalf of AutomationRE (U.S.) Inc. or Dwelling Blocks, LLC. (*Id.* at 16) (quoting *Hazout v. Tsang Mun Ting*, 134 A.3d 274, 290 (Del. 2016) (requiring "a close nexus between the claims involving the corporation which made it a party to the suit, and the conduct of the nonresident fiduciary.")). Plaintiffs' conclusory arguments do not satisfy their burden to show that Haldane's participation is necessary for a final determination in this case or that he has a legal interest in the litigation that is separable from the interests of the other parties under the proper party analysis. Even if Plaintiffs met their burden to establish the statutory requirements under Section 3114(b), they have not demonstrated that the due process requirement is satisfied. *See Illumina, Inc. v. Guardant Health, Inc.*, C.A. No. 22-334-GBW-CJB, 2023 WL 1407716, at *16 (D. Del. Jan. 31, 2023) (noting that due process requirement may not be met even when Section 3114(b) requirements are satisfied when the lawsuit does not involve the entity's status as a Delaware corporation and the harms alleged do not implicate fiduciary duties or corporate governance practices).

Plaintiffs also contend that the Canadian Defendants are subject to jurisdiction under Rule 4(k)(2), the federal long-arm statute, which allows a district court to exercise personal jurisdiction over a foreign defendant whose contacts with the United States satisfy due process. (D.I. 115 at 10-11) Under Rule 4(k)(2), personal jurisdiction over a foreign defendant exists when: (1) the case arises under federal law; (2) the foreign defendant lacks sufficient contacts

with any single state to subject it to personal jurisdiction there; and (3) the foreign defendant has sufficient contacts with the United States as a whole to satisfy due process. *Robert Bosch*, 70 F. Supp. 3d at 680. Here, Plaintiffs rely on the pleaded allegations in their FAC and arguments made in the briefing to establish contacts with the United States.[16] (D.I. 115 at 10-11) By not offering evidence to support the exercise of personal jurisdiction under Rule 4(k)(2), Plaintiffs have failed to meet their burden. *See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 259 (3d Cir. 2000) (explaining that the plaintiff has "the burden of coming forth with competent evidence demonstrating that [the defendant] had sufficient contacts with the United States to justify the court's assertion of either specific or general personal jurisdiction."); *Commisseriat*, 293 F. Supp. 2d at 430 (holding that evidence showed the defendant "is subject to jurisdiction in some other state or states, rather than prove [the defendant] is not subject to jurisdiction in any state as required for this Court to exercise jurisdiction under Rule 4(k)(2).").

Plaintiffs' position that Haldane, Mednikov, Dial, and Ovcharenko are subject to personal jurisdiction in Delaware due to their roles as Haldane's co-conspirators is similarly unpersuasive. (D.I. 115 at 18-19) Plaintiffs make conclusory allegations backed only by citations to the FAC, without evidentiary support. (*Id.*) Therefore, I recommend that the court GRANT Defendants' Rule 12(b)(2) motion to dismiss the Canadian Defendants for lack of personal jurisdiction.[17] If adopted, this recommendation would result in a partial dismissal of Counts I to V and Counts VII to IX, as indicated by the unshaded cells recommending dismissal of only the specified

---

[16] Plaintiffs cite to some excerpts from Haldane's deposition testimony that address Haldane's formation of AutomationRE (U.S.) Inc. in Delaware. (D.I. 115 at 11) But the formation of a Delaware entity, by itself, is not enough to satisfy due process. *See You Map*, 2021 WL 3171838, at *7. Plaintiffs cite no evidence suggesting that the Canadian Defendants developed the software in the United States or entered into contracts in the United States.

[17] There is a fully briefed motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6). (D.I. 84) The court will address the Rule 12(b)(6) motion in a separate Report and Recommendation.

Defendants, and a full dismissal of Count VI and Counts X to XIII, as indicated by the shaded cells in the chart below:

| COUNT | CLAIM | RECOMMENDED OUTCOME |
|---|---|---|
| Count I | Direct and Indirect Copyright Infringement under 17 U.S.C. § 101 *et seq.* | GRANT Rule 12(b)(2) motion to dismiss the Canadian Defendants |
| Count II | Violations of Digital Millennium Copyright Act under 17 U.S.C. § 1201, *et seq.* | GRANT Rule 12(b)(2) motion to dismiss the Canadian Defendants |
| Count III | Trade Secret Misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836 | GRANT Rule 12(b)(2) motion to dismiss the Canadian Defendants |
| Count IV | Direct and Indirect Patent Infringement under 35 U.S.C. § 271 | GRANT Rule 12(b)(2) motion to dismiss AutomationRE Inc. |
| Count V | Civil Conspiracy | GRANT Rule 12(b)(2) motion to dismiss the Canadian Defendants |
| Count VI | Breach of Fiduciary Duties | GRANT Rule 12(b)(2) motion and DISMISS Count VI |
| Count VII | Aiding and Abetting Breach of Fiduciary Duties | GRANT Rule 12(b)(2) motion to dismiss AutomationRE Inc. |
| Count VIII | Tortious Interference with Contracts | GRANT Rule 12(b)(2) motion to dismiss the Canadian Defendants |
| Count IX | Tortious Interference with Business Relationships | GRANT Rule 12(b)(2) motion to dismiss the Canadian Defendants |
| Count X | Violation of Computer Fraud and Abuse Act under 18 U.S.C. § 1030 | GRANT Rule 12(b)(2) motion and DISMISS Count X |
| Count XI | Breach of SPA and Restrictive Agreement to the SPA | GRANT Rule 12(b)(2) motion and DISMISS Count XI |
| Count XII | Breach of Employment Agreements and Company Policies | GRANT Rule 12(b)(2) motion and DISMISS Count XII |
| Count XIII | Conversion | GRANT Rule 12(b)(2) motion and DISMISS Count XIII |

Because there is no dispute that AutomationRE (U.S.) Inc. and Dwelling Blocks, LLC are subject to personal jurisdiction in Delaware and are therefore not subject to dismissal under Rule 12(b)(2), the court proceeds to address the TRO motion as it applies to these Defendants.

## B.    Temporary Restraining Order

A TRO or preliminary injunction is an "extraordinary remedy" that should be granted only in "limited circumstances." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). TROs "are ordinarily aimed at temporarily preserving the status quo." *Hope v. Warden*

*York Cty. Prison*, 956 F.3d 156, 160 (3d Cir. 2020). The "status quo," as defined by the United States Court of Appeals for the Third Circuit, is the "the last, peaceable, noncontested status of the parties." *Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 318 (3d Cir. 2015) (internal quotation marks and citation omitted).

A motion seeking a TRO is subject to the same standards as a motion seeking a preliminary injunction. *Deluna v. Del. Harness Racing Comm'n*, C.A. No. 19-1788-MN, 2019 WL 5067198, at *2 (D. Del. Oct. 9, 2019) (citing cases). Consequently, a party moving for injunctive relief must establish two factors: (1) "it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not[ ])[;]" and (2) it must show "that it is more likely than not to suffer irreparable harm in the absence of preliminary relief[ ]." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). If the movant satisfies its burden of showing a likelihood of success on the merits and irreparable harm, the court must then consider "whether 'the balance of equities tips in [the movant's] favor' and whether 'an injunction is in the public interest.' " *Bullock v. Carney*, 463 F. Supp. 3d 519, 523 (D. Del. 2020) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008)); *see also Reilly*, 858 F.3d at 179. "Failure to establish any of the elements, especially either of the first two, renders preliminary injunctive relief inappropriate." *Deluna*, 2019 WL 5067198, at *2 (internal quotation marks and citations omitted).

As an initial matter, the court considers whether the requested injunctive relief amounts to a mandatory injunction, which seeks to change the status quo, or a prohibitive injunction, which seeks to preserve the status quo. *See Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013); *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). A movant seeking a prohibitive injunction is subject to the exacting standard

of review for preliminary injunctive relief, while a movant seeking a mandatory injunction is subject to an even more demanding standard. *English v. Trump*, 279 F. Supp. 3d 307, 316 (D.D.C. 2018). "[A] mandatory injunction is an extraordinary remedy that is only granted sparingly by the courts[,]" and the movant bears a "particularly heavy" burden to show that its right to mandatory injunctive relief is "indisputably clear." *Trinity Indus.*, 735 F.3d at 139 (internal citations and quotation marks omitted).

> Here, Plaintiffs request the entry of a TRO enjoining each of the Defendants from:
>
> (1) directly or indirectly, on behalf of itself or any other individual or entity, further accessing, disclosing, or using any of Plaintiffs' Trade Secrets or confidential information; and
> (2) directly or indirectly, on behalf of itself or any other individual or entity, from further using, importing, marketing, distributing, licensing, offering for sale, or selling the Knock-Off Software, and from otherwise directly or indirectly infringing Anow U.S.'s Copyrighted Software, including but not limited to, reproducing, distributing, licensing, and/or creating further derivative works.

(D.I. 29-1 at 2) Defendants contend that the requested relief is a disfavored mandatory injunction because it would require Defendants to take the positive act of removing their software from the market. (D.I. 52 at 8-9) Plaintiffs challenged this characterization of the requested relief at oral argument, alleging that the requested injunction does not require a positive act and seeks only to prohibit Defendants from using the allegedly stolen source code. (10/8/2025 Tr. at 34:14-19) The characterizations of both sides hold some truth—Plaintiffs want Defendants to stop using the allegedly stolen software, and the practical effect of this prohibition may result in the removal of Defendants' only product from the market. (D.I. 52 at 19) In this vein, courts have recognized that "[t]he distinction between mandatory and prohibitory injunctions is not without ambiguities or critics[,]" and "[d]etermining whether the status quo is to be maintained or upset has led to distinctions that are more semantic[ ] than substantive." *Tom Doherty Assocs.*, 60 F.3d at 34 (internal quotation marks and citations omitted).

For the reasons set forth below, the court need not conclusively determine whether the relief sought is prohibitory or mandatory because Plaintiffs have failed to establish a likelihood of success under either standard. *See, e.g., English*, 279 F. Supp. 3d at 316; *Reign Blue Corp. v. Gateway Com. Fin., LLC*, 2013 WL 5744506, at \*10 (E.D.N.Y. Oct. 23, 2013).

### 1. Likelihood of success on the merits

Plaintiffs have failed to establish a likelihood of success on the merits of their claim for copyright infringement,[18] which requires proof of "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *see also Brownstein v. Lindsay*, 742 F.3d 55, 77 n.16 (3d Cir. 2014). Regarding the first element, Plaintiffs contend the copyright registration for the copyrighted software constitutes *prima facie* evidence of the validity of the copyright and Anow U.S.'s ownership of the material. (D.I. 30 at 12) Defendants do not dispute that Plaintiffs own a valid copyright for the November 11, 2021 release of "Anow Appraisal Direct."[19] (D.I. 52 at 13; 10/8/2025 Tr. at 35:8-16)

Plaintiffs contend that the second element is satisfied because: (1) it is undisputed that Defendants had access to the copyrighted work through Plaintiffs' employment of Haldane, Mednikov, Dial, and Ovcharenko, and (2) indirect evidence shows that Defendants' allegedly

---

[18] At oral argument, Plaintiffs represented that their claim for misappropriation of trade secrets rises and falls with their copyright claim for purposes of the TRO motion. (10/8/2025 Tr. at 50:14-51:1) Consequently, the court does not separately analyze Plaintiffs' likelihood of success on the merits of their trade secret misappropriation claim.

[19] The parties dispute whether changes made to the software after the issuance of the copyright in November of 2021 should be considered derivative of the copyrighted work, or whether Plaintiffs were required to assert a claim for infringement of the later-issued copyright in August of 2025 to encompass those changes. (10/8/2025 Tr. at 13:10-14:3, 72:5-15) The court does not reach this issue based on the recommendation that Plaintiffs have not shown a substantial similarity between their software and Defendants' product, even when subsequent changes and updates to the software are considered.

infringing software is substantially similar to the copyrighted work. (10/8/2025 Tr. at 45:20-46:2; D.I. 30 at 12) (citing *Dun & Bradstreet Software Servs. v. Grace Consulting, Inc.*, 307 F.3d 197, 218 (3d Cir. 2002)). For purposes of this motion, the court assumes without deciding that Defendants had access to the copyrighted work through their employment by Plaintiffs.[20] Nonetheless, Plaintiffs' evidence of copying falls short of establishing a likelihood of success on the issue of substantial similarity.

When asked to describe their best evidence of copying, Plaintiffs identified the source code comparison in the Kovanis Declaration,[21] which focuses on the appraiser scorecard feature and specifically identifies 56 lines of correlated code out of more than 180,000 lines of Dwelling Blocks Code. (10/8/2025 Tr. at 40:7-42:14; D.I. 45 at ¶¶ 15, 34, 37, 40; D.I. 57 at ¶ 18) Plaintiffs correctly contend that a *de minimis* amount of allegedly copied source code may not be dispositive of an infringement claim, but if the copied work is qualitatively valuable then the quantitative amount has less significance. (10/8/2025 Tr. at 44:4-45:2) (citing *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 565 (1985)). Nonetheless, Plaintiffs fail to tie this legal principle to Kovanis's source code analysis, which was based on the similarities in the

---

[20] Plaintiffs contend that Mednikov and Dial intentionally destroyed evidence of their source code theft by wiping their Anow computers shortly before resigning, in violation of company policy. (D.I. 87 at 5-6) The totality of the evidence presents a more complex picture. For example, Dial testified that he wiped his computer before shipping because he was concerned about shipping the computer with sensitive information on it. (D.I. 55 at ¶ 16; D.I. 88, Ex. LL at 81:3-13) Mednikov likewise testified that he was unaware of the policy to preserve data when returning his device, he believed the best practice was to wipe his computer before sending it back, and he received no instructions otherwise at the time of his resignation. (D.I. 88, Ex. JJ at 92:3-95:22) Both Dial and Mednikov confirm that they backed up all of their work data and the code they wrote for Plaintiffs to GitHub before they resigned so it would continue to be accessible to Plaintiffs. (D.I. 55 at ¶ 22; D.I. 54 at ¶ 30) Plaintiffs do not seek sanctions for the alleged destruction of evidence.

[21] Evan Kovanis is Plaintiffs' source code expert. (D.I. 45 at ¶¶ 11, 14) Plaintiffs proffered the Kovanis Declaration as evidence that the Dwelling Blocks source code is substantially similar to the Anow codebase. (*Id.* at ¶¶ 15-31)

scorecard variable names as opposed to the qualitative functionality of those variables. (D.I. 87 at 3 n.3; D.I. 88, Ex. MM at 69:9-13; D.I. 57 at ¶¶ 21, 25, 29) Kovanis's deposition testimony confirms that he assessed only whether the code "appears to be part of an appraiser scoring process or functionality[,]" and he "didn't get into how this code is used by the rest of the code[.]" (D.I. 59, Ex. C at 27:7-16)

Plaintiffs cite a portion of Giuseppe Lucido's deposition testimony[22] stating that the appraiser scorecard feature is foundational, and UWM likely would not have licensed the Dwelling Blocks software if it did not include an appraiser scorecard. (10/8/2025 Tr. at 45:3-12; D.I. 88, Ex. KK at 76:17-77:18) But Lucido also testified that appraiser scorecards were "more widely used in the industry" and were required by UWM. (D.I. 88, Ex. KK at 75:13-18) This testimony supports Defendants' position that every appraisal system and appraisal management company offers scorecard functionality, and UWM required both Plaintiffs and Dwelling Blocks to provide "customizable appraiser scoring based upon criteria provided by UWM." (D.I. 52 at 12; D.I. 53 at ¶¶ 62-63; D.I. 56 at ¶¶ 8, 19) To the extent that the scorecard functionality is substantially similar in both the Anow and Dwelling Blocks software, the record before the court supports Defendants' position that the similarities are the result of UWM's stated requirements, as opposed to Defendants' copying of Plaintiffs' protected software. (D.I. 56 at ¶¶ 8, 19)

Plaintiffs also submit the declaration and amended declaration of Dan Sydenham,[23] who compared the Dwelling Blocks software and the Anow Software. (D.I. 32; D.I. 128)

---

[22] Giuseppe Lucido is the Senior Vice President of Operations at UWM who offered evidence on UWM's interactions with Haldane and Voxtur regarding software development and, in particular, appraiser scorecards. (D.I. 56)

[23] Dan Sydenham is the Senior Director of Development at Voxtur. (D.I. 32 at ¶ 1) Haldane initially hired Sydenham as a software developer for Anow Canada in 2014 and played a role in the development of the Anow Software. (*Id.* at ¶ 3) Based on his knowledge of the Anow Software, Sydenham engaged in a comparison of the Dwelling Blocks and Anow Software as a fact witness for Plaintiffs. (*Id.* at ¶¶ 18-32)

Sydenham's screen captures appear to show some similarities between the software programs in terms of dashboard categories and filters. (D.I. 32, Exs. U-V) However, Sydenham clarifies in his amended declaration that the appearance of the Anow dashboard is configurable, and he configured the Anow dashboard specifically to highlight similar functionality and display capabilities.[24] (D.I. 128 at ¶ 13) A comparison of Anow's default dashboard categories with the Dwelling Blocks dashboard does not establish substantial similarity. (D.I. 53 at ¶¶ 45-46; Ex. 5)

This conclusion is further supported by the Datamatics report commissioned by Plaintiffs, which determined that a visual interface inspection of features including the dashboard "did not reveal any direct copying or replication of specific interface elements." (D.I. 59, Ex. A at AN0000073-78) At oral argument, Plaintiffs emphasized the conclusion of the Datamatics report that suggested the similarities between the interfaces "give rise to reasonable suspicion of potential conceptual replication or unauthorized influence." (*Id.* at AN0000078) But this equivocal statement is followed by the report's ultimate conclusion that "the evidence obtained does not substantiate a definitive claim of direct code copying from Anow.com":

> In conclusion, while the evidence obtained does not substantiate a definitive claim of direct code copying from Anow.com, the similarities observed in design concepts, API structures, and schema elements give rise to reasonable suspicion

---

[24] Defendants accuse Plaintiffs of fabricating evidence in Sydenham's declaration and suggest that sanctions may be warranted. (D.I. 52 at 7-8, 11) The court finds no basis to award sanctions. In his amended declaration, Sydenham explains that he configured the Anow dashboard to emphasize the similarities between the Dwelling Blocks software and the Anow Software in Exhibit U of his declaration. (D.I. 32, Ex. UU; D.I. 128 at ¶ 13; *see also* D.I. 59, Ex. B at 59:22-60:12) Haldane confirms as much, stating that "[u]nlike Dwelling Blocks, Anow has settings that allow a user to customize the dashboard to change what columns are shown and the order of the columns[.]" (D.I. 53 at ¶ 45) Modifying customizable settings to support one's position is not the same as fabricating an email thread, as Defendants suggest. (D.I. 52 at 11-12) (citing *Network Data Rooms, LLC v. Saulrealism LLC*, 2022 WL 17404501, at *3 (S.D.N.Y. Dec. 2, 2022)). The same is true of Exhibit AA to Sydenham's declaration, which compares the "auto assign" pages and application programming interfaces ("APIs") of the Dwelling Blocks software and the Anow Software. (D.I. 32 at ¶ 22, Ex. AA) During his deposition and in his supplemental declarations, Sydenham clarified that he wrote an example of execution for the "auto assign" feature in the Anow Software. (D.I. 59, Ex. B at 48:3-49:10; D.I. 128 at ¶ 22)

of potential conceptual replication or unauthorized influence. These findings warrant further legal examination to determine the extent of any intellectual property infringement.

(*Id.*) Because Plaintiffs' evidence falls short of establishing that the parties' software products are substantially similar, Plaintiffs have not met their burden to establish a likelihood of success on the merits.

### 2. Irreparable harm to Plaintiffs

Because an injunction should issue "only if the plaintiff produces evidence sufficient to convince the district court that *all four* factors favor preliminary relief[,]" the court need not assess the remaining three factors. *Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 1438 (3d Cir. 1994) (emphasis in original; internal citations omitted). Nonetheless, the court considers whether Plaintiffs have shown that "immediate irreparable harm—rather than possible harm in the future—is likely in the absence of an injunction." *Mallinckrodt Pharms. Ireland Ltd. v. Airgas Therapeutics LLC*, C.A. No. 22-1648-RGA, 2025 WL 472557, at *7 (D. Del. Feb. 12, 2025) (citing *Winter v. Nat'l Res. Def. Council, Inc.*, 55 U.S. 7, 22 (2008)). Plaintiffs have not met their burden here.

Defendants contend that Plaintiffs' delay in seeking a preliminary injunction weighs against a showing of irreparable harm. (D.I. 52 at 17) Although not generally dispositive on its own, a plaintiff's delay in seeking enforcement of its rights "tends to indicate at least a reduced need for such drastic, speedy action." *Lanin v. Borough of Tenafly*, 515 F. App'x 114, 118 (3d Cir. 2013) (internal citations and quotation marks omitted). Delays of two months have been found sufficient to preclude a showing of irreparable harm, and delays approaching one year are routinely fatal to a finding of irreparable harm. *See Tourmaline Mgmt. LLC v. Tourmaline*

*Capital Partners, LLC*, C.A. No. 25-740-MN, 2025 WL 2338069, at *2 (D. Del. Aug. 13, 2025) (collecting cases).

Here, Defendants cite several dates by which they contend Plaintiffs should have known enough to seek preliminary injunctive relief: (1) August of 2024, when Dial did not return his computer when he resigned from the company; (2) December of 2023, when Defendants became aware of Mednikov's GitHub emails; (3) April 2, 2025, when Defendants responded to Plaintiffs' cease and desist letter; and (4) January of 2024, when Dwelling Blocks's website became publicly available. (D.I. 52 at 17-18) Plaintiffs only specifically respond to Defendants' identification of Dial's failure to return his computer in August of 2024. (D.I. 87 at 9) They otherwise suggest the need to proceed to litigation was not apparent until Defendants' second response to Plaintiffs' cease and desist letter on April 22, 2025. (*Id.*)

With respect to Dial's failure to return his computer in August of 2024, Plaintiffs contend that they "did not know at the time that Dial formed AutomationRE, along with his former employees, to compete with Plaintiffs or to develop infringing software."[25] (D.I. 87 at 9) This argument is not persuasive. Haldane's Employment Agreement dated November 29, 2023 expressly discloses Haldane's association with "AutomationRE and any affiliates" and provides that Haldane may continue development work for AutomationRE during his employment by Voxtur. (D.I. 31, Ex. H at § 6(a) & Ex. A) Plaintiffs also acknowledge that, in May of 2024, Haldane encouraged Voxtur to enter into the Draft Consulting Agreement with UWM which would allow Haldane, through AutomationRE (U.S.), to develop software on UWM's behalf in the interest of preserving UWM's status as a Voxtur customer. (10/8/2025 Tr. at 19:24-20:24;

---

[25] Plaintiffs provide no citation to support the factual accuracy of this statement in their reply brief. (D.I. 87 at 9) The evidence as a whole indicates that Haldane formed AutomationRE, and Dial is a partial owner of AutomationRE who is responsible for servicing and maintaining AutomationRE's code and interfacing with UWM. (D.I. 53 at ¶ 10; D.I. 55 at ¶ 4)

*see also* D.I. 53 at ¶¶ 17-18 & Ex. 2)  Plaintiffs represent that this proposal made them "angry" because they "didn't want to give up the rights to their key asset."  (10/8/2025 Tr. at 19:24-20:15)  In light of these statements, Plaintiffs' position that they did not suspect Defendants might develop infringing software and/or compete with Plaintiffs after Haldane and Dial both resigned from Voxtur on August 30, 2024 is not credible.  (D.I. 25 at ¶¶ 6, 68, 100)

Thus, Plaintiffs' months-long delay in seeking preliminary injunctive relief after Dial failed to return his computer in August of 2024 demonstrates a lack of irreparable harm. Plaintiffs do not contest Defendants' position that Plaintiffs learned of Mednikov's GitHub emails in December of 2023 or that Dwelling Blocks's website became publicly available in January of 2024, and they do not explain why they waited a year and a half after those events before moving for a TRO.  Even if the court were to accept Plaintiffs' proposed date of April 22, 2025, this date falls nearly two months before they filed their original TRO motion on June 18, 2025.  (D.I. 10; D.I. 31, Ex. P)  Delays of this length have been found to indicate a reduced need for preliminary injunctive relief.  *See Tourmaline Mgmt.*, 2025 WL 2338069, at *2.

Moreover, the alleged harms identified by Plaintiffs do not establish irreparable harm. Plaintiffs suggest there is a presumption of irreparable harm when a party is in possession of another party's confidential information.  (D.I. 30 at 17)  But the risk of irreparable harm from a defendant's possession of confidential information is not enough to satisfy the requirement absent a showing that any use or disclosure is "immediate."  *See ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) ("Establishing a risk of irreparable harm is not enough.  A plaintiff has the burden of proving a clear showing of immediate irreparable injury." (internal citations and quotation marks omitted)).  Instead of showing a threat of immediate irreparable harm, however, Plaintiffs focus on events that occurred months before they filed their TRO motion.

"[A] showing of past harm, without more, is insufficient to justify the issuance of a preliminary injunction." *Freedom Med. Inc. v. Whitman*, 343 F. Supp. 3d 509, 530 (E.D. Pa. 2018); *see also Doe v. Del. State Univ. Bd. of Trustees*, 20-1559-MN, 2021 WL 2036670, at *3 (D. Del. May 21, 2021) ("Plaintiff cannot rely on past harms to sustain his burden.").

Here, Plaintiffs allege that Defendants' conduct "has already caused irreparable harm" because Reggora retracted its proposal to purchase Plaintiffs on April 21, 2025, "after comparing Dwelling Blocks to Anow and finding that Defendants are copying Plaintiffs' source code." (D.I. 30 at 18; D.I. 31 at ¶ 39)  They do not cite authority or otherwise explain how this past harm, identified nearly two months after it occurred, can be remedied by a TRO.  Plaintiffs also refer to the past and continued diversion of business from UWM, Plaintiffs' largest customer. (D.I. 30 at 18)  Again, most of this harm occurred in April of 2025, months before Plaintiffs sought relief in this action:  "Between April 15, 2025 and April 23, 2025, when UWM sent its partners an email stating it was adding Dwelling Blocks as an appraisal management platform, in addition to Anow, UWM's business dealings with Anow U.S. rapidly and significantly declined." (D.I. 31 at ¶ 40)  But the evidence of record indicates that UWM began expressing concerns about Plaintiffs' financial health and their ability to fulfill Plaintiffs' needs in late 2023 and early 2024, more than a year before Plaintiffs sought relief in this action.  (D.I. 53 at ¶ 16) In a conversation between Haldane and a Voxtur executive on August 2, 2024, the executive acknowledged that Plaintiffs would ultimately lose UWM as a customer for a litany of reasons, including that Plaintiffs refused to put the source code for the newly developed software in escrow as UWM requested.  (*Id.* at ¶¶ 20-21)

Plaintiffs' allegations of immediate irreparable harm resulting from the continued diversion of business from UWM are also unpersuasive because Plaintiffs delayed in seeking

relief even after filing the TRO motion. After filing their renewed TRO motion on July 11, 2025, Plaintiffs stipulated to an extended briefing schedule that provided for the completion of briefing on August 22, 2025. (D.I. 40) On August 19, 2025, the court entered an order scheduling oral argument on the TRO motion for October 8, 2025. (D.I. 77) Weeks before the upcoming hearing, but prior to filing for bankruptcy, Plaintiffs cancelled their contract with UWM.[26] (10/8/2025 Tr. at 55:13-56:2, 66:17-22, 105:3-11; D.I. 160) In their briefing, Plaintiffs implicitly acknowledge that a TRO would not halt the loss of UWM as a customer because that harm had already occurred. (D.I. 30 at 18 ("Indeed, since Plaintiffs filed the Complaint in this case, UWM has completely terminated its business with Anow."); D.I. 87 at 9 ("UWM only switched to AutomationRE U.S.'s platform entirely shortly before Plaintiffs filed their renewed TRO.")).

For the first time in their reply brief, Plaintiffs argue that "even if UWM does not go back to using Anow U.S.'s software, Defendants will steal Plaintiffs' potential business opportunities by offering their Knock-Off Software." (D.I. 87 at 10) The briefing does not elaborate on these "potential business opportunities" first raised at the conclusion of briefing, thus denying Defendants a fair opportunity to respond.[27] *See* D. Del. LR 7.1.3(c)(2) ("The party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief."). The court may decline to consider Plaintiffs' argument on this

---

[26] At oral argument, counsel explained that Plaintiffs cancelled their contract with UWM because the SaaS Agreement contained an escrow provision that gave an escrow company full control over the source code for the Anow Software. To terminate the escrow agreement and regain control over the source code, Plaintiffs were forced to terminate their agreement with UWM. (10/8/2025 Tr. at 105:8-106:7)

[27] Plaintiffs' reservation of this issue for the reply brief and their failure to offer specifics are also incongruent with a finding that the claimed harm is immediate and irreparable.

basis alone. *See Dasso Int'l, Inc. v. Moso N. Am., Inc.*, C.A. No. 17-1574-RGA-MPT, 2021 WL 3476197, at *16 (D. Del. July 25, 2021).

Plaintiffs' allegations of future irreparable harm also fail on the merits. At oral argument, Plaintiffs specified that they would face difficulties growing or selling the company in the future. (10/8/2025 Tr. at 51:7-52:3, 108:23-109:6) But Plaintiffs do not offer a compelling case that these future harms are causally related to Defendants' alleged conduct. *See Waters Corp. v. Agilent Techs. Inc.*, 410 F. Supp. 3d 702, 713 (D. Del. 2019); *see also CommScope, Inc. v. Rosenberger Tech. (Kunshan) Co. Ltd.*, 2021 WL 1560717, at *4 (D.N.J. Apr. 20, 2021) ("The plaintiff must . . . demonstrate a causal connection between the harm alleged and the conduct to be enjoined."). As previously discussed, Plaintiffs' financial problems and UWM's concerns about Plaintiffs' performance predated any alleged attempts by Defendants to develop infringing software.

Plaintiffs also fail to meet their burden to show irreparable harm because their alleged injuries are economic in nature and cannot constitute irreparable harm as a matter of law. *See Airbus SAS v. Anaconda, Inc.*, C.A. No. 25-178-CFC, 2026 WL 115005, at *3 (D. Del. Jan. 15, 2026) (citing *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988)). Plaintiffs' loss of the $23 million sale to Reggora, the loss of UWM as their primary customer, and their alleged inability to sell the company for monetary consideration can be remedied with monetary compensation. *See Figueroa v. Precision Surgical, Inc.*, 423 F. App'x 205, 211 (3d Cir. 2011) (concluding that "evidence focused on [the movant's] projected loss of income and the diversion of business interests" indicated that "any injury was compensable through a monetary damages award[,]" even if the action may result in the destruction of the business). Plaintiffs allude generally to case authority concluding that "the loss of assets like

future business opportunities, client goodwill and an employer's reputation" may constitute irreparable harm, but they do not connect those allegations to any specific alleged harm in this case. (D.I. 30 at 18) These vague and conclusory allegations are too speculative to support a finding of irreparable harm. *See Airbus*, 2026 WL 115005, at *3.

### 3. Balance of hardships and public interest

The final two factors also weigh against the entry of a TRO. Plaintiffs do not dispute that an injunction would cause Defendants to lose their jobs and result in the shuttering of their business. (D.I. 87 at 10; *see also* D.I. 52 at 19; 10/8/2025 Tr. at 66:4-9) In contrast, the record before the court demonstrates that the harms suffered by Plaintiffs were likely to occur despite Defendants' alleged conduct. *See* § II.B.2, *supra*. Defendants have also shown that the public interest disfavors injunctive relief that would harm third parties by interfering with Defendants' efforts to process about 20,000 appraisals and inspections every month for UWM to assist with mortgage loans. (D.I. 52 at 19-20) Instead of refuting Defendants' representation, Plaintiffs deflect, stating "Defendants had no care for third parties on Plaintiffs' platform when UWM switched to using Dwelling Blocks['s] platform." (D.I. 87 at 10) As discussed, UWM's inclination to move away from Plaintiffs' platform began more than a year before UWM's email to appraisers about Dwelling Blocks in April of 2025. (D.I. 53 at ¶¶ 16, 20-21)

For the foregoing reasons, I recommend that the court DENY Plaintiffs' renewed TRO motion. (D.I. 29)

### 4. Bond

Defendants contend that Plaintiffs should be required to post a bond if the court is inclined to grant the TRO motion, emphasizing the likelihood that AutomationRE will be put out of business if the injunction is granted. (D.I. 52 at 20) Having recommended that the court deny

Plaintiffs' renewed TRO motion, I further recommend that the court deny as moot Defendants' request to require Plaintiffs to post a bond because the request is conditioned on the entry of any injunctive relief.

### C.     Motion for Fee Bond

Defendants' motion for fee bond seeks a bond from Plaintiffs in the amount of $500,000 to partially cover attorneys' fees and costs if Defendants ultimately prevail in the litigation or, alternatively, as a sanction for Plaintiffs' alleged fabrication of evidence in support of their renewed TRO motion.  (D.I. 107 at 1)  In support of the requested relief, Defendants focus on Plaintiffs' precarious financial circumstances and the likelihood that Plaintiffs would not be able to meet their obligations at the end of the litigation.

I recommend that the court DENY Defendants' motion for fee bond in the exercise of its discretion.  Defendants argue that, "if [Plaintiffs] lose the TRO, then they think they can simply retreat across the border to Canada and/or file bankruptcy[,]" and the posting of a bond is necessary "[t]o preclude this gamesmanship[.]"  (D.I. 107 at 1)  Plaintiffs have now filed for bankruptcy, and granting Defendants' motion for fee bond will not preclude what has already occurred.  (D.I. 160; D.I. 162)  Defendants' motion otherwise appears more focused on opposing the renewed TRO motion than on providing solid legal grounds for fee shifting decisions at this preliminary stage of the case.[28]

I further recommend that the court DENY Defendants' motion for sanctions based on Plaintiffs' alleged fabrication of evidence in support of the renewed TRO motion.  "Generally, a

---

[28] Defendants rely on a 2005 unpublished case from the Southern District of New York, *RLS Associates, LLC v. United Bank of Kuwait, PLC*, 2005 WL 578917, at *1 (S.D.N.Y. Mar. 11, 2005).  The court's analysis in *RLS* was based on the application of a local rule permitting the imposition of a bond in some cases to secure costs and attorneys' fees.  *Id.*  Defendants cite no comparable local rule in this district.

court's inherent power should be reserved for those cases in which the conduct of a party or an attorney is egregious and no other basis for sanctions exists." *Martin v. Brown*, 63 F.3d 1252, 1265 (3d Cir. 1995); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ("Because of their very potency, inherent powers must be exercised with restraint and discretion."). For the reasons set forth at § II.B.1, footnote 24, *supra*, the court is not persuaded by Defendants' allegations of falsified evidence. Defendants' inflammatory language does not advance their argument. (D.I. 107 at 1, 4, 14, 16)

## III.  CONCLUSION

For the foregoing reasons, I recommend that the court: (1) GRANT the motion to dismiss the Canadian Defendants for lack of personal jurisdiction, (D.I. 80); (2) DENY Plaintiffs' motion for a TRO, (D.I. 29); and (3) DENY the motion for a fee bond, (D.I. 106).

Given that the court has relied upon material that technically remains under seal, the court is releasing this Report and Recommendation under seal, pending review by the parties. In the unlikely event that the parties believe that certain material in this Report and Recommendation should be redacted, the parties shall jointly submit a proposed redacted version by no later than **February 12, 2026**, for review by the court, along with a motion supported by a declaration that includes a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *See In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (quoting *Miller v. Ind. Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994) (internal quotation marks omitted)). If the parties do not file a proposed redacted version and corresponding motion, or if the court determines the motion lacks a meritorious basis, the documents will be unsealed within fourteen (14) days of the date the Report and Recommendation issued.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: February 5, 2026

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE